**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William D. SCHIMMEL, a/k/a Billy D.
Schimmel, Defendant–Appellant.**

No. 90–1508.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1991.

Decided Sept. 26, 1991.

Christina McKee, Asst. U.S. Atty. (argued), Office of U.S. Atty., Indianapolis, Ind., for U.S.

Rick L. Middleton (argued), Lansing, Mich., for defendant-appellant.

Before CUMMINGS, WOOD, Jr., and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Defendant–Appellant William D. Schimmel appeals his conviction for making false statements to a financial institution in violation of 18 U.S.C. § 1014. We affirm.

## I. FACTS AND PROCEEDINGS BELOW

On September 22, 1989, a grand jury returned a two count indictment charging William D. Schimmel with over-valuing his assets on two separate financial statements submitted to the American Fletcher National Bank (AFNB) for the purpose of influencing the bank to provide him with a loan in the amount of $15,000.

On January 16, 1990, the defendant went to trial on charges of making false statements to a financial institution in violation of 18 U.S.C. § 1014. The defendant filed a motion *in limine* out of the jury's presence, requesting that the court exclude evidence regarding financial statements submitted to the People's Bank and Trust Company of Indianapolis and the Fidelity Bank of Carmel, Indiana in previous loan applications. Responding to the request, the court instructed counsel for both parties not to proffer any evidence relative to the defendant's dealings with these banks prior to a determination of the admissibility of such evidence pursuant to Federal Rule of Evidence 404(b).[1] The Assistant United States Attorney in his opening statement did, however, advise the jury as to the

anticipated testimony of two of its witnesses, Lamar Richcreek and Charles Conoley, who were to testify regarding the defendant's prior banking activities. At the conclusion of the government's opening statement, defense counsel moved for a mistrial. The court at this time conducted a hearing on the admissibility of the prior bad acts involving the defendant's use of false financial statements, and ruled the evidence admissible only as to the intent, common scheme, plan, or motive of the defendant pursuant to Federal Rule of Evidence 404(b).

J. Andrew Harp, Chief Deputy Clerk of the U.S. Bankruptcy Court in Indianapolis, testified on behalf of the government. Harp stated that the defendant Schimmel was the sole director, officer, and shareholder of Coach King, Inc., a manufacturer of travel trailers in Elkhart, Indiana. In November 1984, Coach King, Inc. was the subject of an involuntary bankruptcy filed by several of its creditors in the Northern District of Indiana. Eugene Gwin, previously a plant manager for one of the defendant's companies, testified that the defendant formed a business known as SDB Fiberglass Engineering (SDB) to manufacture lightweight travel trailers and stated that the defendant had organized a group of companies to perform certain functions in the manufacturing and marketing of the lightweight travel trailers.

At trial, Lamar Richcreek, a bank official of People's Bank and Trust Company of Indianapolis, stated that in January 1985, SDB had a checking account and two outstanding commercial loans totalling $15,000 with People's Bank. Richcreek related that in February 1985, the defendant submitted a financial statement to People's Bank with his request for a third loan which included representations that the defendant was the possessor of a cash value interest in the amount of $629,000 in stocks and securities in four closely-held corpora-

---

1. Rule 404(b) states that:
  "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

tions. People's Bank denied the defendant's request for a third loan. Richcreek further testified that the defendant made one payment of $4,000 in May of 1985 on the two outstanding loans but this occurred only after the bank's attorneys had instituted collection proceedings. Thereafter, the People's Bank closed SDB's checking account occasioned by an overdraft of approximately $10,000.

Charles Conoley, a loan officer with Fidelity Bank of Carmel, Indiana, testified that in February 1985, the defendant applied for a $100,000 line of credit from Fidelity Bank. (This occurred approximately one month before the defendant applied to American Fletcher National Bank for a loan, the loan application giving rise to the indictment in this case). According to Conoley, the defendant presented a financial statement accompanying his loan application which listed, in addition to the stocks and securities valued at $629,000 (previously listed for loan purposes at another bank), a home and business property located at 1417 Commerce Avenue in Indianapolis. The defendant failed to disclose that he had deeded the home to his wife and that he held only a lease interest with an option to purchase on the business property.[2] Fidelity Bank refused to grant the loan.

Immediately after the direct examinations of Richcreek and of Conoley, the court instructed the jury to consider their testimony only as it pertained to the defendant's intent, common scheme, plan, or motive in accordance with Rule 404(b).

Evelyn Finnell, a "metropolitan lender" with American Fletcher National Bank (AFNB)[3] also testified on behalf of the government and stated that the defendant when applying to AFNB on March 21, 1985, for a $15,000 loan to SDB, submitted a personal financial statement to AFNB listing stocks and securities owned by him valued at $629,000. The statement also listed business properties valued at $325,000, including the 1417 Commerce Avenue property.[4]

Finnell stated that at the bank's insistence the defendant personally guaranteed the $15,000 loan AFNB made to SDB. AFNB made the $15,000 loan to SDB on March 22, 1985 relying upon the information provided by the defendant in his financial statements. After granting the loan, AFNB learned of the defendant's $25,000 prior debt to People's Bank and of the Coach King prior bankruptcy. In a subsequent meeting with one of the bank's loan officers, the defendant admitted giving false information in that he failed to disclose the $25,000 debt to People's Bank because he feared the loan would not have been granted had AFNB known the true facts.

Finnell testified that on March 29, 1985, AFNB restructured SDB's loan as a personal loan to the defendant. During the meeting arranged to accomplish the restructuring, the defendant admitted that his wife had title and was the owner of their home. The defendant further asserted that although he did not own the business property, he intended to exercise an option in his lease to purchase the property.

Approximately one month later, on April 25, 1985, in response to AFNB's attempts to obtain additional financial information, the defendant provided AFNB with what he referred to as an updated personal financial statement. This statement listed that he owned real estate valued at $1,025,000, as well as securities owned and valued

---

**2.** Defendant defaulted on the lease for the business property located at 1417 Commerce Avenue in January 1985.

**3.** AFNB is now part of the Bank One system.

**4.** The Commerce Avenue business property is the same real estate defendant had previously leased although on this statement the defendant represented that he was the owner. The defendant further listed himself as the owner of the home which he had "quit claimed" to his wife in September 1984. The defendant provided a credit reference on his loan application which in fact was later discovered to be a business operating out of his home and using his home telephone number.

at $2,700,000.[5] When questioned as to how the value of the securities had increased so dramatically from the $629,000 in February 1985 to the $2,700,000 figure given on April 25, 1985, the defendant testified that this updated financial statement included a more complete list of the businesses he owned.[6]

On January 18, 1990, following a three-day trial, the jury returned a verdict of guilty on both counts of the indictment. On February 23, 1990, the district court imposed a two-year prison sentence on Count One and a one-year prison sentence on Count Two and ordered that the terms of incarceration be served consecutive to each other and further ordered that the defendant pay $24,431.44 in restitution to Bank One (the successor institution to AFNB) and a $100 assessment.

## II.  ISSUES FOR REVIEW

On appeal, the defendant-appellant William D. Schimmel contends that (1) the district court abused its discretion in denying the defendant's motion for mistrial premised on the government's alleged disregard of the motion *in limine* on certain prior bad acts; (2) that the prosecutor's alleged misconduct makes reversal necessary; and (3) the trial court committed plain error in giving its jury instruction on witness credibility.

## III.  DISCUSSION

### A.  Motion for Mistrial

■ Initially we address the defendant's contention that the trial court abused its discretion in denying the defendant's motion for mistrial on the basis of the government's alleged disregard of a motion *in limine.*  After the filing of the motion and before opening argument, the district court instructed counsel for both parties not to proffer any evidence relative to the defendant's prior dealings with several banks and his use of false financial statements prior to a judicial determination of the admissibility of such evidence pursuant to Federal Rule of Evidence 404(b).  Nonetheless, in the government's opening statement, the United States attorney advised the jury as to the anticipated testimony of several witnesses regarding the defendant's prior banking activities.  At the conclusion of the government's opening statements, the defense counsel moved for a mistrial, and after a hearing on the admissibility of these prior bad acts involving the defendant's use of false financial statements, the court denied the motion and ruled the evidence admissible.  On appeal, the defendant does not argue that the court's decision to admit the evidence dealing with his use of false financial statements under Rule 404(b) was erroneous, rather he argues that "the dissemination of that information to the jury in advance of the court's ordered and necessary approval 'irretrievably damaged' defendant."  We reject the defendant's argument that the district court abused its discretion in denying his motion for mistrial.

■ We note that evidence can only be introduced through witnesses, and an attorney's opening statement does not constitute evidence.  The jury was instructed by the trial judge prior to the opening argument and also during trial that statements made by lawyers during opening and closing arguments were not to be considered as evidence and should not be considered by them in arriving at their verdict: "We generally must assume that the jury followed the court's cautionary instructions."  *United States v. Mealy,* 851 F.2d 890, 903 (cita-

**5.**  The real estate listed included the Commerce Avenue property on which the defendant previously held a lease and other real estate which the defendant had contracted to purchase.

**6.**  The defendant listed the book value of his companies at $2,720,000 consisting of a group of companies related to SDB organized by the defendant in early 1985.  The companies had virtually no assets and were allegedly headed by various employees of SDB.  One of the compa-

nies, Gwin International, was sold to the defendant for $25, the amount of money in SDB's checking account, in February of 1985.  The defendant listed its value as $100,000 on the updated (April 25, 1985) financial statement submitted to AFNB.  The defendant stated in a personal bankruptcy proceeding filed in October of 1985 that he owned stock in the companies listed on the financial statement.

tion omitted). Moreover, the trial judge, who was in the best position to determine whether the incident was so serious as to warrant a mistrial, promptly heard argument outside the presence of the jury and ruled that the motion be denied:

> "... and I was listening carefully to make sure that the motion *in limine* was not violated. It seems to me that the motion *in limine* was not violated because of the government's submission that it will have evidence to prove that based on statements that were made to other banks it can establish that the statements made to Bank One were false."

At this time, prior to the introduction of the evidence, the trial judge also ruled that the jury would be given instructions on the introduction of the Rule 404(b) evidence. This court has previously stated:

> "A trial judge has broad discretion in deciding whether, in the context of the entire trial, a defendant's motion for a mistrial should be granted. We will not reverse the trial court's decision unless it was an abuse of discretion. In deciding whether the court abused its discretion, we must keep in mind that a trial judge is often in the best position to determine whether an incident was so serious as to warrant a mistrial." *United States v. Mealy*, 851 F.2d 890, 902 (7th Cir.1988) (citations omitted).

Finally, the prosecutor's remarks were made during his opening statement in a trial which lasted some three days and where the evidence of guilt was overwhelming. Thus, we refuse to hold that the district court abused its discretion by denying the defendant's motion for mistrial because the record fails to convince us that the defendant suffered any prejudice from the reference in the opening statement to evidence which the court subsequently found to be admissible.

## B. Alleged Prosecutorial Misconduct

■ The defendant also argues that "[t]he prosecutor's misconduct was persistent and pronounced and its probable cumulative effect was so consequential as to make reversal necessary." The defendant's major contention regarding the alleged prosecutorial misconduct relates to an alleged improper appeal to the pecuniary interests of the jurors during the prosecutor's closing argument:

> "We also heard talk about the big, bad bank and being wealthy, and this was just a $15,000 loan. You have to remember that the law, the federal law against lying to banks is there for a reason; it's to protect depositors. People make up banks. People like you and I, and like the defendant, go in and deposit their money, and it's loaned out to people like Mr. Schimmel. Well, that law is there, the crime—the law that says it's a crime to lie to the bank is there to protect depositors."

This court has previously stated that an appeal to the pecuniary interests of the jurors is unquestionably an unacceptable predicate for argument in a criminal trial: "Since pecuniary interests would necessarily disqualify a prospective juror from service, it is patently improper to make an appeal to that interest in closing argument." *United States v. Scott*, 660 F.2d 1145, 1170 (7th Cir.1981) (citations omitted). In support of his argument that the prosecution improperly appealed to the pecuniary interests of the jurors, the defendant cites *United States v. Trutenko*, 490 F.2d 678 (7th Cir.1973), a case in which the prosecutor told the jurors that they were paying high insurance premiums because of schemes to defraud insurance companies like the defendant's. The court found the comment to be improper, yet it refused to overturn the conviction. *Id.* at 679–80. We believe that the prosecutor's comment in the case before us, while not improper, borders on being somewhat questionable and thus, we will determine whether the statement requires reversal of the defendant's conviction.

Because the defendant failed to object to this argument at trial, the standard of review pursuant to Federal Rule of Criminal Procedure 52 is plain error. This court recently stated that "[t]he test for determining if a prosecutor's closing argument

requires reversal of the conviction is whether the remarks were so prejudicial that the defendant was deprived of a fair trial." *Shepard v. Lane*, 818 F.2d 615, 621 (7th Cir.1987) (citations and quotation omitted). Furthermore, our review must "consider the prosecutor's conduct not in isolation, but in the context of the trial as a whole, to determine if such conduct was 'so inflammatory and prejudicial to the defendant ... as to deprive him of a fair trial....'" *Id.* (citation and quotation omitted). In *Shepard*, the prosecutor referred to the petitioner at various times as a liar, a dog, and an animal, and stated that it was "too bad" that the police officers had not broken the petitioner's skull. He further stated that the police officer could have killed the petitioner and would have been doing the taxpayers a favor by doing so. *Id.* at 621. Nonetheless, in spite of this unlawyerlike conduct, this court concluded that "in the context of the trial as a whole, the statements were not 'so inflammatory and prejudicial to the defendant ... as to deprive him of a fair trial.'" *Id.* at 622 (citations and quotation omitted).

In the case at bar, the evidence of the defendant's guilt presented, including the defendant's use of false financial statements during the three-day trial, was so overwhelming that the prosecutor's statement in closing argument neither prejudiced the defendant nor interfered with his right to a fair trial. Moreover, the comment did not implicate any specific rights of the defendant nor was the comment a misstatement of the evidence.

Furthermore, we must also "consider whether and to what extent the improper remark was provoked by the defense counsel's argument—the so-called 'invited response' doctrine." *United States v. Swiatek*, 819 F.2d 721, 730 (7th Cir.1987). Referring to the invited response theory, it is interesting to note that defense counsel, in his closing argument, suggested that the prosecution of the defendant was undertaken at the insistence of the victim bank, a bank which had just built the "largest building in the State of Indiana...." The defense counsel stated that the loan was a small one made by the bank officers, and that getting "stuck" with bad loans was perhaps something banks might "factor into their rates...." In turn, the prosecutor noted that the law against providing inaccurate information to banks was not written to protect the bank as a business, but was written to ensure the depositors' interest in preserving the solvency of the bank. The prosecutor's mistake in judgment was *only* that he compared the depositors to the members of the jury in response to defense counsel's frivolous suggestion that bad loans will not affect the solvency of a bank. "We stress, as we have so often in the past, that by holding that the prosecutor's remarks did not deny the defendant a fair trial, we do not intend to condone them." *Swiatek* at 731.

■ The defendant also argues that the "aggressive tenor" of the prosecutor's cross-examination of the defendant amounted to misconduct. This argument is without merit. For example, the defendant portrays the following examination by the prosecutor of the defendant as argumentative: "I'm not asking you who you hired; I'm asking you, did accounting records exist for SDB Fiberglass Engineering" and similarly, "Well, how about we do this? Are any of those suits listed on your April 25, 1985, financial statement?" These examples of proper cross-examination, cited in defendant's brief as being argumentative, serve only to demonstrate the speciousness of the defendant's argument. Indeed, any aggressive cross-examination by the government's attorney was mandated as a result of the defendant's refusal to answer the questions he was asked. The court admonished the defendant approximately fifteen times during the course of his testimony directing that he answer the questions asked of him and further advised him more than twenty times during trial that he must not make speeches in the guise of testimony. Therefore, any alleged aggressive cross-examination resulted from the defendant's cantankerous conduct in refusing to directly respond to the questions. The defendant has fallen far short of establishing that the prosecutor's al-

leged misconduct necessitated reversal of his conviction.

## C. Jury Instruction Regarding Witness Credibility

■ Finally, the defendant argues that the trial court committed reversible error in giving a jury instruction on witness credibility because the instruction implied that all evidence impacted on each witness's credibility, and the defendant further contends that the instruction precluded the jury from accepting any of the defendant's uncorroborated testimony if it found that he had knowingly testified falsely as to any material fact. Specifically, the defendant objects to the following jury instruction:

"**Jury Instruction 9**

"You are the judges of the credibility—that is, the believability—of the witnesses.

"Inconsistencies or discrepancies in the testimony of different witnesses, may or may not cause you to discredit such testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently; an innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or to an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood. *Reconcile conflicting testimony if you can; but if you cannot, then you must determine whom you will not believe and what is the truth.*

"*If you find that any witness knowingly testified falsely as to any material fact and issue, I instruct you that you may disregard all of the evidence given by that witness if that evidence is not corroborated by other evidence.*"[7]

The defendant contends that the jury instruction "wrongly implies all evidence impacts on each witness' credibility ... and forecloses the jury's acceptance of uncorroborated testimony by [the defendant] if the jury finds any of his testimony knowingly false."

Jury Instruction 9, commonly known as "Falsus In Uno, Falsus In Omnibus," has been rejected by this court. *See United States v. Monzon,* 869 F.2d 338, 346 (7th Cir.1989). In *Monzon,* this court upheld the district court's decision not to grant the defendant's request for the following instruction:

"If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness' testimony and other particulars; and you may reject all the testimony of that witness or give it such credibility as you may think it deserves."

*Monzon* at 346. The Second Circuit, in an opinion written by Judge Friendly, also rejected the "Falsus In Uno, Falsus In Omnibus" instruction finding it to be "absolutely false as a maxim of life." *United States v. Weinstein,* 452 F.2d 704, 713 (2nd Cir. 1971), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). Furthermore, the D.C. Circuit, in an opinion written by Judge Scalia, noted that "[w]hile the falsus in uno instruction has been ciiticized frequently as superfluous and potentially confusing, no federal circuit, to our knowledge, has held that the giving of such an instruction will result in automatic reversal." *Parker v. United States,* 801 F.2d 1382, 1385 (D.C.Cir.1986).

However, the defendant did not object to the "Falsus In Uno" jury instruction at trial, and pursuant to Federal Rule of Criminal Procedure 52, this court can address plain errors or defects only if the alleged error affects "substantial rights."

---

7. The jury instruction went on to add:
"In determining the credibility of a witness, including the defendant, you may take into consideration his or her interest or lack of interest in the result of this suit; the manner and bearing on the witness stand; the means or lack of means of knowing the facts about which he or she has testified; how far if at all, the witness's testimony is either supported or contradicted by other evidence; the witness's power of memory or the lack thereof; inconsistent statements made by the witness, if any; and from all the evidence you will give to each witness the credit to which he or she is entitled."

Therefore, we must determine whether the use of the "Falsus In Uno" jury instruction constituted plain error:

> "A plain error is not just one that is conspicuous but one whose correction is necessary to prevent a 'miscarriage of justice,' *United States v. Young*, 470 U.S. 1, 15 and n. 12, 105 S.Ct. 1038, 1046 and n. 12, 84 L.Ed.2d 1 (1985), and therefore *'it is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court,'* *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977).... [T]here is no miscarriage of justice if the defendant's guilt is so clear that he would certainly have been convicted even if the error had never been committed; hence 'plain error must be of such a great magnitude that it probably changed the outcome of the trial.' *United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir.1987)." *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir.1988) (citations omitted).

This is not one of those "rare case[s] in which an improper instruction justify[s] reversal of a criminal conviction when no objection has been made in the trial court." *Id.* Initially, the defendant's argument that the "instruction forecloses the jury's acceptance of uncorroborated testimony by defendant if the jury finds any of his testimony knowingly false" is itself false because the instruction states, "you may disregard," not "you must disregard," any evidence given by a witness if that evidence is not corroborated by other evidence. Moreover, as the court instructed the jury in its preliminary charge, nothing the court said or did was intended to suggest what its verdict should be, and it was for the jury to decide "which witnesses to believe, which witnesses not to believe, and how much of the witness's testimony to accept or reject." Finally, the evidence of the defendant's guilt was overwhelming: "An evidentiary error is harmless if the untainted evidence against the defendant is overwhelming...." *Monzon* at 345. We hold that the use of this "Falsus In Uno"

jury instruction did not reach the level of plain error.

## IV. CONCLUSION

The decision of the district court is AFFIRMED.